And we'll hear Sonja Dotson v. City of Syracuse. You may proceed. May it please the court. The case of Tomasi, this court found... Please speak right into it. I'm sorry. In the case of Tomasi v. Insignia Financial Corporation, this court said that the relevance of discriminatory remarks doesn't depend on the offensiveness, but their tendency to show the decision-maker was motivated by assumptions or attitudes relating to the protected class. That was in 2007. In this case, Judge Mordew, after remand from this court, considered the evidence, he said as a whole, and made the same similar finding that the plaintiff had failed to show sufficient evidence of issues of fact as to whether or not plaintiff was discriminated against on the basis of her gender. The district court relied on the case of Nugent v. St. Luke's Roosevelt Hospital. In that case, which was a hostile work environment, a retaliatory hostile work environment case, the issue of pretext was not considered. They didn't get beyond the prima facie case. The court here, on the remand, made a finding that there was insufficient evidence of pretext. We submit that there is more than sufficient evidence of pretext and issues of material fact as to whether or not Sonia Dotson was discriminated against on the basis of her gender. The evidence includes the statements by the decision makers regarding women in the department, calling them names, and if it is comparisons between race and gender discrimination. If you take the gender discriminatory remarks and supplant them with racist remarks, I think that brings the point home that the statements by these defendants regarding women in the department, and by the way, in the context of taking adverse action against other female officers in the department, that that becomes directly relevant and is circumstantial evidence of discriminatory intent. That motivating factor, whether they were motivated by her gender, is also illustrated by the fact that there were male officers who were given far less discipline. Now, opposing counsel says there is a difference between the male officers, because they were uniformed policemen, and your client. What is your reply to that? Your Honor, the record shows at A-121, sergeants give orders to CSOs, captains give orders to CSOs. That's by corporation counsel during my client's arbitration proceeding. There was a respect to the courtesy is a subject of the rules and regulations of the department, A-127, referring to a commanding officer. My client had a commanding officer. Officer is in the title of her job, community service officer. There is also a reference to the standard of conduct for police officers, which is what she was charged with. She was not charged with violating a standard of conduct for community service officers. She was charged with... Do I understand you to say that everything that she was charged with applies just as much to the others? Is that your argument? Exactly. You can hear from the other side. Exactly. The defendants have also complained that there is this distinction with similarly situated because of a fourth department appellate division decision that made that finding. In that case, the defendants said, well, the distinction between the male officers and Sonia Dotson is that her conduct was off-duty. The male officers' conduct was on-duty. So then you have this shifting explanation as to why there's some kind of a different standard here. Is your argument that with respect to that, the position is a fortiori, that your client was less guilty than the others? Is that what you're saying? That's correct. And there's issues of fact, whether the charge against her was materially false. They said she swore. Why would they lie about that? The witnesses said there was no profanity used by my client. What I found interesting was that the district court seemed to indicate that the fact of insubordination was undisputed and yet you'd won an arbitration in which there was a finding that there was no insubordination. The facts surrounding the insubordination are disputed both by your client and by a witness. The insubordination finding is not preclusive and you don't make that argument as to whether it did or didn't occur. It's admissible under our case law, subject to the discretion of the court, is it not? If you went to trial, you'd be able to establish that she was found not to have been insubordinate by an arbitrator. I've seen cases that go both ways on that. There's an analysis as to how fair the proceeding was, whether people were allowed to call witnesses, etc. There was a proceeding, whether how that ruling goes or not, but it struck me that the district court concluded that it was not disputed that there was insubordination and yet your brief indicates that you don't think that the fact, that fact itself is established or conceded, is it? No. I believe that that shows that when the arbitrator made the finding there was no insubordination. You'd never get to the animus. You'd never get to the comparators. If indeed it wasn't the case, then the discriminatory comments by the individuals, even though they're extended out in time, might be relevant with regard to the fact that they decided to write her up and for something that ultimately was found not to have occurred. If an arbitrator can make that finding, a reasonable juror can. That's our argument on that. It's weird because Judge Mordew's decision recites the arbitration award rescinding the suspension. Correct. It doesn't cite the arbitrator's finding that no insubordination occurred. Right. So then you get to the basis for the charge and the evidence of the pretext, I think, in the record is replete with all kinds of examples, including the falsity of the charge, the disparate treatment, the post hoc rationalizations, the overt bias towards women, the unusually harsh penalty as admitted by the defendants, Kleist's statements in his job, don't hire any more females, I've got enough problems, in the context of taking those adverse actions. I see I've run out of time. If you want, you may use some of your rebuttal time. I'll come back. Thank you. Good morning, Your Honors. May it please the Court. I'm Kristen Smith, Corporation Counsel for the City of Syracuse. I want to address some of the things we've discussed already here today. With respect to the arbitration award, the evidence in the record we would submit is undisputed, that she engaged in the conduct. She has admitted in the record... Well, no, it is disputed. She says that she didn't yell and that she didn't curse, and she has another witness that said that she didn't curse. We have an arbitrator's finding that she wasn't insubordinate. Insubordination is a conclusion, it's not a fact. Right. She was not disciplined for cursing. She was disciplined for not following an order. She admitted in the record that three times being told to stop the conversation and sit down, she didn't do that. She also admitted in the record that she yelled. Do you consider that the arbitrator's award is potentially admissible in a jury trial as to the finding of not being insubordinate? The arbitrator said that she actually did sit down with her in a reasonable period of time. I haven't looked at that issue close enough to say whether it would be admissible or not. Well, I did last night, and it is. Many of the cases you cite are cases where there is a requirement of but-for motivation for the action. But in this area, I don't believe it is but-for. It can be one part of the motivation. And isn't that relevant to this issue which we have been discussing as to whether it is potentially pretextual? That is, there may have been other reasons for this. But if gender was one of the motives, then that is enough to survive, isn't it? I agree that some of the cases were age cases that would be a but-for standard, and this is not a but-for standard. It's a motivating standard. There were quite a few of those that you relied on in your brief, and I was a little confused. I don't think that's outcome determinative. If you look at the law, I agree that Tomasi is an important case here. And what that case says is that the more remote and oblique remarks are in relation to the adverse action, the less probative they are. And here, I would say that all of the remarks are both remote and oblique. In terms of the general... Explain to me oblique. I actually had to Google that yesterday. These remarks are pretty dramatic with respect to gender. I mean, the remarks about women are mighty direct. Now, they may be remote. That's a different question. But the oblique kind of troubled me. I mean, it seemed pretty darn direct to me. Well, the way I read oblique, I think it's actually aided by the Henry case, where you look at who made the remark, when they made the remark, the content, and the context. So in terms of context, that's a critical point. These both were made, you know, we agree it was remote in time, but were about entirely different circumstances, had nothing to do with this particular plaintiff or this particular employment decision. I would say that because they happened so long ago, one was four years before this event, another was two years after, and it had nothing to do about this particular circumstance. Wouldn't you think, I mean, if your life depended on it, wouldn't you want to know about these remarks as what might be motivating somebody with respect to women? I mean, when there are remarks which are so direct, now, again, the fact that one was before, even a long time before, and then you get this other one after, that's kind of suggestive of an attitude and a point of view, isn't it? I don't mean it's determinate. I think it's unfair to take these remarks that happened so far removed and then allow that to become evidence for all time, that any time these officers interact with a woman, that they will have to basically get an automatic pass to a trial because once they make that remark, it sticks with them forever. So that's why I think that there is this test of remote and oblique and the context and the timing and all those things. It serves a purpose, and I think that purpose should illuminate the consideration of those remarks here. I'd like to address the situation of police officer versus community service officer since you raised the question. These two groups, like plaintiff acknowledged, there was a decision in the, I know it doesn't bind you, but the Fourth Department did decide with these particular parties that these two types of employees are not similarly situated. Significantly, they're both governed by labor contracts, two different labor contracts. One is a CSEA employee, plaintiff. The police officers are part of the PBA. The discipline is handled differently. I understand that these are different employees, but does any of that difference go to the particular discipline, the particular violations? That is, it may be two people that are different, but are they both governed by the same standards? That's what the opposing counsel has argued, and that's why I said then that I expected you to answer that. Yes, I'd very much like to answer that. And I think the particular insubordination rule is in the rules and regs that are applicable to both groups. However, you can't understate the significance of these labor contracts and the procedures that are required to be followed under them. It very much illuminates and influences how discipline is meted out. There are certain past practices with respect to police officers that might not apply to community service officers. They're just treated very differently, civilians versus, or I don't want to concede they're treated differently, but you have to view them differently because they fall under these different labor contracts. Wouldn't one think that this would be a more serious violation by a uniformed officer? That this kind of insubordination, that insofar as there are differences, that they would cut against you? If there was evidence that routinely insubordination resulted in lesser penalty, I suppose, but I think a lot of the actual pieces... That's a different question as to whether there were differences. I'm just now asking about to the extent that these two are not identically situated in respect to this, which is what you were arguing, which violation would you think would require a more grievous penalty, an off-duty action by a non-uniformed as against a on-duty by a uniformed? I think that would really depend on the context of the particular incident. Fair enough. If I may, there's one other point I'd like to address that Plaintiff raises in her brief regarding trying to create the nexus between the very, I would say, remote statements and this employment action. She points to the alleged demeaning way that she was treated. I just want to point out that that is not gender-specific in any way. I don't think it should be viewed as evidence of gender discriminatory conduct because people are demeaning to each other at work for any number of reasons. There are any number of maltreatments that are simply not covered by our law. You can be a very nasty employer, and that may be a state action, but it isn't a federal one. That's exactly my point, and so I don't think that supplies the nexus. I don't have anything else if you have no further questions. I'll get you some of your time back from the first argument. Thank you. Any other questions? No, thank you. We'll hear your rebuttal. Thank you. The remarks by Kleist were not separate in time or context from my client. The record at A178, Kleist's comments came after a news article about Sonia Dotson's lawsuit when he said, Oh great, another female, and Sweeney stated the broads can't work together. Then again, Sweeney directs another coworker to take notes on Sonia's conduct. That's at A1484-185. That in and of itself, the fact that they're taking notes about her, they're listening in on her phone calls, they're reporting back to one another, that shows disparate treatment as well. There is no evidence in the record that there is any other basis for treating her like that. So you can't say that the statements that are discriminatory toward women do not give rise to this inference of discrimination. To be honest, I don't know where this nexus, the test of a nexus comes from that was relied upon by the district court, other than they were looking for some kind of a smoking gun where they could say, Well, because he didn't say you're just a bitch at the time that they charged her, then there's no nexus between the discriminatory attitude that the supervisors have and the treatment that they gave her. And that's the other thing. The treatment that is focused on by the district court and by defense counsel is my client's treatments towards her supervisors. It's not the way that you look at it. You look at it, what was the supervisor's treatments towards her? They left her crying at one point. They did this kind of surreptitious thing. They treated her demeaningly, yes, like a dog, according to a witness. Now, is that because they just didn't like her, or is it because she's a woman, or is it the court has decided it wasn't because she brought a lawsuit or complained about pornography? That's been eliminated out of the context of the situation. So what is it that they're offering as an explanation for this treatment is that she was bad. But that's not what we're looking at in terms of the conduct here. We're looking at how she was treated. What did the defendants do to her? And was that treatment motivated by her gender? Look at CSO Harrington. Now, he's not even a police officer. He's another CSO, a male. He got counseling and a written reprimand for unlawful access to a computer. That's at the record at A240. Sexual harassment allegations, finding of sexual harassment by a police officer. What was the remedy, the penalty that he suffered? Counseling. So the values that are exposed by this conduct I think is relevant, too, as well. And if you look at it in a whole, I don't think that there's any question that there are questions of material fact as to whether or not they were motivated. Thank you. Thank you both. Again, well argued by both sides. We'll reserve decision and we'll hear.